**Sharon SANTOS, Plaintiff,**

**v.**

**SHIELDS HEALTH GROUP, Defendant.**

**Civil Action No. 95–12488–MLW.**

United States District Court,
D. Massachusetts.

March 6, 1998.

Leslie J. Orlando, Boston, MA, Carolyn G. Sullivan, Melick & Porter, Boston, MA, for Plaintiff.

Regina W. Tate, Murphy, Hesse, Toomey & Lehane, Quincy, MA, for Defendant.

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R.C.P. 56(# 23)*

COLLINGS, United States Magistrate Judge.

### I. *Introduction*

In November, 1995, the plaintiff, Sharon Santos (hereinafter "Santos"), instituted this action with the filing of a five-count complaint against the defendant, Shields Health Group (hereinafter "Shields"), alleging violations of the Family and Medical Leave Act of 1993 (hereinafter "FMLA") (Counts I, II, and III), Title 42 U.S.C. § 2000e *et seq.* (Count IV), and Massachusetts General Laws chapter 151B (Count V). Shields answered the complaint, to some degree denying the plaintiff's factual allegations. With the par-

ties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Discovery continued apace and, after its completion, Shields filed a Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56, together with a memorandum of law and supporting materials. In opposition, the plaintiff has submitted a memorandum of law, an affidavit and exhibits. Following oral argument, the defendant's dispositive motion is now poised for decision.

### II. *Facts*

To a great extent, the historical facts underlying this controversy are uncontested. If during this recitation certain facts are disputed, they shall be duly noted.

On February 11, 1991, Santos began her employment as an MRI technician at Shields. (Santos Deposition, # 21, Exh. 1, Interrogatory 5; Santos Affidavit, # 28 at ¶ 1) She initially worked as a per diem employee; later she was made a full time employee at Shields' office in Brockton, Massachusetts. (# 28 at ¶ 2) Brad Field (hereinafter "Field"), the Chief Technologist at Shields, was the plaintiff's immediate supervisor. (# 28 at ¶ 3)

In April 1991, although Santos' physician had scheduled her for surgery to correct a right shoulder problem [1], Santos canceled the operation due to fears that she would have lost her job had she undergone the surgery so soon after she began her employment. (*Id.* at ¶¶ 5, 6) Both prior to 1991, and after the deferred surgery, the plaintiff was treated with cortisone injections by Drs. Harry E. VonErtfelda and Charles Lipson. (*Id.* at ¶ 7)

In July 1993, Santos was again advised by her physician to undergo an operation on her right shoulder because her condition had not improved. (*Id.* at ¶ 8) Upon being informed that surgery was necessary, the plaintiff notified her supervisor, Field, of the situation and requested a leave of absence.[2] (*Id.* at

---

**1.** Prior to Santos' employment with Shields, she had been experiencing a "chronic problem for over five years with [her] right shoulder which continued to deteriorate." (# 28 at ¶ 4)

**2.** According to the Director of Operations at Shields, as far as she knew the surgery was not necessary. (Affidavit of Kathi Benjamin, # 20 at ¶ 3) Also, Shields maintains that plaintiff was able to perform the essential functions of her job

¶ 9) Field asked Santos how long she would be out after the surgery, and she told him that her doctor indicated at least eight weeks, possibly more. (*Id.* at ¶ 10) Santos said she would keep Field informed as to her progress; Field said that was okay but that Santos would need to complete some forms. (# 28 at ¶ 10) The plaintiff's leave of absence was scheduled for August 2, 1993, through October 2, 1993. (*Id.* at ¶ 11; Affidavit of Kathi Benjamin, # 20 at ¶ 2)

Santos understood this leave of absence to be a medical leave covered under the "Leave of Absence" provision in the employee handbook.[3] Defendant agrees, in its memorandum, that Shields approved Santos' eight-week leave in accordance with that policy. (# 24 at 3; Complaint and Answer ¶ 7) On August 2, 1993, the plaintiff underwent right shoulder surgery performed by Dr. Mark Koris. (# 27 at ¶ 12) The following day,[4] Kathi Benjamin (hereinafter "Benjamin"), the Director of Operations at Shields at the time, sent a letter to the plaintiff notifying her that the Family and Medical Leave Act was to become effective on August 5, 1993. (# 20 ¶¶ 1, 4) Not only does Santos assert that she was inadequately informed by Shields of her FMLA rights[5], she further claims never to have been informed of any relationship between the FMLA and Shields' Leave of Absence policy as described in Shields' handbook. (# 28 at ¶ 15) Also, Santos contends that she did not receive any information with regard to Shields' policy for extending FMLA leaves of absence. (*Id.*)

On October 6, 1993, the plaintiff was examined by Dr. Koris, certified as "disabled", and scheduled to be reevaluated on December 7,

1993. (# 27, Exh. D) Shields confirms having received two doctor's certificates through its disability insurance carrier reflecting that the plaintiff would be unable to return to work and would be reevaluated at a later time. (# 20 at ¶ 6; # 24 at 4, fn.1) The first certificate indicated a reevaluation on October 6, 1993 and the second for a subsequent reevaluation on December 7, 1993. (*Id.*) However, Shields maintains that this information was less detailed than what was required to assess the situation. (# 20 at ¶ 6)

On or about October 7, 1993, the plaintiff telephoned her supervisor to confirm the status of her leave and its impact on her reinstatement. (# 28 at ¶ 17) According to Santos, during this conversation Field never told her that her job could be in jeopardy because of the length of her leave; instead, she claims Field told her that her job was secure. (# 28 at ¶ 17) Additionally, the plaintiff insists that she asked Field whether she should see Dr. Koris prior to the scheduled December 7th reevaluation and Field assured her that it was not necessary. (*Id.*)

Approximately one week later, on or about October 15, 1993, Santos again called Field to confirm that her leave would not adversely impact upon her job. (*Id.* at ¶ 18) The plaintiff asserts that during this conversation Field said: "Don't worry, everything is okay, your hours are being filled okay, just get better." (*Id.*) Santos contends that although she specifically asked if an earlier doctor's appointment should be scheduled, Field reiterated that it was unnecessary for her to see Dr. Koris prior to the December 7, 1993 reevaluation.[6] (*Id.*)

---

at the time the leave began. (Santos Dep. 6/24/97, # 21 at 23) Dr. Harry E. VonErtfelda, however, described the procedure as "medically necessary." (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, # 27, Exh. L, Affidavit of Harry VonErtfelda, at ¶ 2)

3. The Shields employee handbook contains a Leave of Absence provision whereby a personal leave of absence may be granted at the discretion of the company. Requests for such a leave "must be submitted in writing to the Administrator and should not exceed a term of six (6) months." (# 28, Exh. B at 13, ¶ P)

4. Although plaintiff's memorandum lists the effective date of the FMLA as "August 3, *1995*," other documents submitted by both parties contain the correct date of "August 3, 1993." (# 27 at ¶ 13) Unless otherwise specified, the inaccurate date will be treated as though it was the correct August 3, 1993 date.

5. However, the parties have stipulated (# 30) that a U.S. Department of Labor publication entitled "Your Rights under the Family and Medical Leave Act of 1993" was received by Santos on or about August 3, 1993.(# 31)

6. Shields maintains that Field informed Santos during this telephone conversation that she had

By letter dated October 21, 1993, Benjamin confirmed that the plaintiff's leave fell under the FMLA and requested that Santos provide a physician certification verifying her disabled status by October 29, 1993. (# 27, Exh. E) Santos avers she had already received a physician certification form from Field, filled it out on October 18, 1993, and forwarded it to Dr. Koris. (# 28 at ¶ 20) Subsequently on October 28, 1993, Field mailed a physician certification form directly to Dr. Koris; information with respect to a definite date for Santos' return to work was not requested. (# 27, Exh. G)

At or before this time, Shields extended Santos' leave of absence to November 17, 1993 to allow her to comply with the medical certification requirements. (# 20 at ¶ 9; # 22 at 45–46) Dr. Koris completed the form on November 8, 1993, and assessed the plaintiff's condition as "Indefinite (but short-term)[.]" (# 27, Exh. F) However, Shields' disability insurance carrier, Phoenix Home Life, filed a claim report signed by Dr. Koris on November 8, 1993, and by the plaintiff on November 9, 1993, showing that Santos' expected date to return to work was December 14, 1993. (# 27, Exh. H) In addition, Shields' paperwork entitled "Leave Documentation" suggests that the plaintiff's leave was extended on October 2nd such that she was to return to work on December 7, 1993. (# 27, Exh. J)

On November 17, 1993, Field requested a meeting with the plaintiff to discuss her employment situation. (# 28 at ¶ 23) Upon arriving at the office, Santos was terminated. (*Id.*; # 27, Exh. K) When the plaintiff asked

for the opportunity to go immediately to Dr. Kiros' office for an evaluation, her request was denied by both Field and Benjamin.[7] (# 28 at ¶ 24) Moreover, when Santos inquired of Field why he had not either told her to return to Dr. Kiros earlier or alerted her to the consequences of not returning to Dr. Kiros before the scheduled December 7, 1993 appointment, his response was: "I'm sorry. This just came up." (*Id.*) Further, the plaintiff maintains that she "never received any telephone calls from Kathi Benjamin regarding my condition or work status or any other matter." (*Id.* at ¶ 25)

Santos claims that another Shields employee, one William McBride, was given two extensions of his FMLA leave without providing defendant with a definite return date.[8] (# 27, Exh. M) The plaintiff also asserts that Paul Champagne, another Shields employee, was granted extensions of his FMLA leave without providing a definite date of return and took nearly seven months of leave before he was terminated.[9] (# 27 at Exh. N, O)

### III. Summary Judgment Standard

When considering whether to grant summary judgment, the Court must determine whether:

> … the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the court must "accept all reasonable inferences favorable to

---

to provide medical certification before Shields would permit an extension of leave beyond October 28, 1993. (Field Dep. 8/19/97 # 22 at 40) Field claims that he does not recall Santos informing him during their conversation that her next medical evaluation was scheduled for December 7, 1993. (*Id.* at 40–1)

**7.** Benjamin and Field felt it would be inappropriate to alter her initial medical certificate—stating Santos was unable to return to work at the end of her approved leave—because a new evaluation "may not accurately reflect Ms. Santos' true physical ability at that time her leave expired." (# 20 at ¶ 13)

**8.** Shields asserts that William McBride's situation differed insofar as McBride's surgery was

deemed necessary by Shields and Santos' surgery was not. (# 20 at ¶ 15) Shields also contends that McBride was able to provide a definite return to work date prior to the expiration of his FMLA leave whereas Santos was not. (*Id.*)

**9.** Shields argues that Paul Champagne was treated no differently than the plaintiff, stating: "Shields granted a leave to Mr. Champagne at the same time as Ms. Santos and had his leave similarly adjusted to the effective date of the Act." (# 20 at ¶ 16) Shields claims that the failure by Champagne to provide a FMLA physician certificate with a definite return to work date was the reason for his termination. (*Id.*)

the nonmovant." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 205 (1st Cir. 1996); *see also Lawton v. State Mut. Life Assurance Co. of America*, 101 F.3d 218, 222–23 (1st Cir.1996); *Borschow Hospital and Medical Supplies v. Cesar Castillo, Inc.*, 96 F.3d 10, 12 (1st Cir.1996); *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir.1996); *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 608 (1st Cir.1996).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine", the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1st Cir.1996); *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996); *Roche*, 81 F.3d at 253. In weighing whether a factual dispute is "material", the court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Vinick v. Commissioner of Internal Revenue*, 110 F.3d 168, 171 (1st Cir.1997); *Sanchez*, 101 F.3d at 227; *Roche*, 81 F.3d at 253. "Thus the substantive law defines which facts are material." *Sanchez*, 101 F.3d at 227 (citing *Anderson*, 477 U.S. at 247–48).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. *See Int'l Ass'n of Machinists and Aerospace Workers*, 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470(1993)("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose.")). Rather, Rule 56(c):

mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. Discussion

One of the stated purposes of the Family and Medical Leave Act is "to entitle employees to take reasonable leave for medical purposes." Title 29 U.S.C. § 2601(b)(2). According to the law:

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following:

\*　　\*　　\*　　\*　　\*　　\*

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Title 29 U.S.C. § 2612(a)(1)(D).

In order to establish a prima facie case for a claim under the FMLA, it is incumbent upon a plaintiff to prove that:

(1) [s]he is protected under the Act; (2) [s]he suffered an adverse employment decision; and (3) either [s]he was treated less favorably than an employee who had not requested FMLA leave or the adverse decision was made because of h[er] request for leave.

*Watkins v. J & S Oil Co., Inc.*, 977 F.Supp. 520, 522 (D.Me.1997); *Beckendorf v. Schwegmann Giant Super Markers, Inc.*, 1997 WL 191504, \*3 (E.D.La.1997); *Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 259 (N.D.Miss. 1995), *aff'd*, 74 F.3d 91 (5th Cir.1996).

The defendant advances several reasons why it is entitled to the entry of judgment as a matter of law in its favor on the three counts of the complaint premised upon this statute. Initially Shields contends that because Santos did not suffer from a "serious health condition" within the meaning of the statute, she need not be afforded the protec-

tions furnished by the FMLA. The term "serious health condition" is defined as:

an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

Title 29 U.S.C. § 2611(11)(A)-(B).

The defendant asserts that the plaintiff's shoulder surgery was not medically necessary and, consequently, that she was not entitled to leave under the FMLA [10]. By contrast, Santos takes the position that she was eligible under the FMLA because she was receiving "continuing treatment by a health care provider." Title 29 U.S.C. § 2611(11)(B). Under the regulations, this means, inter alia, that "[t]he employee or family member in question is treated two or more times for the injury or illness by a health care provider." 29 C.F.R. § 825.114(b)(1).

Pursuant to the interim regulations in effect at the time of plaintiff's leave, continuing treatment by a health care provider did not include "conditions for which cosmetic treatments are administered (*such as most treatments for acne or plastic surgery*)...unless inpatient hospital care is required or unless complications develop." 29 C.F.R. § 825.114(c) (emphasis added).

Shields argues that the plaintiff's surgery to repair a painful condition which had deteriorated over a five-year period was a "cosmetic treatment." However, in his affidavit, Dr. VonErtfelda's states that the shoulder surgery was medically necessary. Furthermore, although the regulations exclude plastic surgery from coverage under the FMLA, a period of absence "for restorative surgery after an accident *or other injury*" is not prohibited [11]. Next the defendant urges that since Santos was able to perform the essential functions of her job at the time her leave initially commenced on August 1, 1993, she

could not, by definition, be suffering from a serious health condition. In the legislative history of the FMLA, however, Congress explained that leave under the Act

does not mean that the employee must be so incapacitated that the employee is unable to work at all, but that it may include necessary absence from work to receive treatment, during which time the employee would be temporarily "unable to perform the functions of the position."

58 Fed.Reg. 31794, 31800 (June 3, 1993).

The inclusion of absences from work to receive treatment suggests that Congress intended to give its approval to persons not only *currently unable* to perform essential job functions but also those who *will be unable* to perform the essential functions of their job once treatment has been administered.

In any event, given the circumstances of this case the issue as to whether Santos had a "serious health condition" need not be decided. Rather, it shall be assumed, arguendo, that she did and, hence, that she was entitled to the protections of the FMLA.

As a primary basis for her FMLA claims, Santos contends that Shields did not adequately notify her as to her rights and obligations pursuant to the Act. The applicable regulations mandate that every employer covered by the FMLA post a notice explaining the provisions of the FMLA on its premises. *See* 29 C.F.R. § 825.300(a). An additional requirement is that employers "furnish additional notice and information to employees on entitlements and obligations for FMLA leave...by furnishing written guidance when employees request FMLA leave." 58 Fed.Reg. 31794, 31804.

The defendant had given Santos a copy of Shields' employee handbook (# 27, Exh. B) prior to her initial request for leave. The handbook provides for a "Leave of Absence" that "should not exceed six (6) months." (*Id.* at 13, ¶ P) Indeed, in July of 1993 the plain-

---

10. It is noted that it was Shields via its Director of Operations Benjamin that designated the plaintiff's leave as falling within the coverage of the FMLA.

11. Santos stated in her deposition that her chronic shoulder injury was due to wear and tear and repetitive motion at work. She also testified that her doctor could not rule out a partial tear of her rotator cuff.

tiff requested her leave pursuant to the Shields "Leave of Absence" provision to begin on August 2, 1993 before the effective date of the FMLA. Subsequently Shields notified Santos in a letter dated August 3, 1993, that her leave of absence was to be converted into a FMLA leave beginning the effective date of the FMLA–August 5, 1993.

The parties have stipulated that with the August 3rd letter Santos received from Shields a U.S. Department of Labor publication entitled "Your Rights under the Family and Medical Leave Act of 1993." (# 31) A pertinent regulation reads:

> [a]ny leave taken prior to the Act's effective date may not be counted for purposes of FMLA. If leave qualifying as FMLA was underway prior to the effective date of the Act and continued after the Act's effective date, only that portion of leave taken on or after the Act's effective date may be counted against the employee's leave entitlement under the FMLA.

29 C.F.R. § 825.103(a).

Moreover the FMLA provides that: "Nothing in this Act...shall be construed to discourage employers from adopting *or retaining leave policies more generous* than any policies that comply with the requirements of this Act...." Title 29 U.S.C. § 2653 (emphasis added).

Once again, however, in the circumstances of this case whether a genuine issue of fact exists vis-a-vis the sufficiency of the notification given to Santos with respect to her rights and obligations under the FMLA does not have to be decided because any such issue of fact would not be material. Rather, resolution of the defendant's motion with regard to the plaintiff's FMLA claims turns on a more fundamental point.

There is no dispute that Santos began her FMLA leave on August 5, 1993, and was terminated on November 17, 1993, fifteen weeks later. On or about November 8, 1993, i.e., in her thirteenth week of leave, Santos' doctor certified that she "is current (sic) recoving (sic) from 8/2/93 surgery and cannot use her arm for any activities at this point", the duration of this condition being described as "indefinite (but short-term)".[12] (# 27, Exh. F) In other words, it is uncontested that both at the end of twelve weeks of leave and in fact through the time of her termination three weeks thereafter, the plaintiff was unable to perform the essential functions of her job as a result of her disability[13].

The bottom line is that Santos received more than that to which she was entitled under the FMLA, to wit, twelve workweeks of leave. In the context of this case, any inadequacy found to exist with respect to advising the plaintiff of her rights and obligations under the Act does not change this basic fact. Moreover, because she was unable to perform the functions of her position at the expiration of fifteen weeks of leave, Santos was not injured by any insufficiency in notification[14]. *See, e.g., Watkins,* 977 F.Supp. at 523 ("Indeed, if after twelve weeks of leave Plaintiff was unable to return to work, Defendant was thereafter under no duty to provide him with equivalent employment. If at the end of the FMLA leave period, 'the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA.' 29 C.F.R. § 825.214(b)."); *Beckendorf,* 1997 WL 191504, at *3 ("[The plaintiff] was not capable at the end of the twelve week period to return to her job. Even accepting as true [the plaintiff's] contention that she received a restricted release to return to employment on November 1, 1994, the 12 week period expired on or about October 21, 1994."); *Urbano v. Continental Airlines, Inc.,* 1996 WL

---

**12.** Apparently on the same day Dr. Koris completed a form evaluation regarding the plaintiff for the disability insurance company wherein he opined that: "Patient is to be reevaluated 12/7/93. She is considered disabled from all types of employment until at least that date." (# 27, Exh. H)

**13.** The plaintiff's request that she be given the chance to get another evaluation does not undercut the clear opinion given by her doctor on November 8th.

**14.** The defendant notes that Santos received disability insurance payments until January, 1994.

767426, at *4 (S.D.Tex.1996) ("Plaintiff does not dispute that she has received ninety days of family/medical leave.") This quite simply is not a case where it can be said that any failure to notify interfered with the employee's rights under the FMLA. *Compare, Fry v. First Fidelity Bancorporation*, 1996 WL 36910, at *5 (E.D.Pa.1996).

For the reasons stated, the plaintiff's claims under the FMLA must fail.

■ Turning now to the discrimination claims under federal and state laws, Counts IV and V respectively, in order to make out a prima facie case of disparate treatment, Santos must

> 'Identify and relate specific instances where persons situated similarly "in all relevant aspects" were treated differently.' *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989)(*quoting Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986)). 'The test is whether a prudent person looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.' *Id.* 'Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.' *Id.*

*Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997).

Presuming that Santos is able to establish a prima facie case by a preponderance of the evidence that she was subjected to gender discrimination,

> 'the employer must then come forward with some non-discriminatory justification, and the plaintiff finally is given the opportunity to convince the trier of fact that the justification was pretextual and that the real reason was discriminatory.' *Cuello–Suarez v. Puerto Rico Elec. Power Auth.*, 988 F.2d 275, 278 (1st Cir.1993).

*Molloy*, 115 F.3d at 91.

The analysis of the state law disparate treatment claim is basically the same as that applied to the federal claim. *See, e.g., Beal v. Board of Selectmen of Hingham*, 419 Mass. 535, 544 n. 5, 646 N.E.2d 131, 138 n. 5 (1995); *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 440–45, 646 N.E.2d 111, 114–17 (1995)("[O]nce a plaintiff has established a prima facie case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L. c. 151B.") In the present case, Shields responds to Santos' argument that two other male employees—William McBride and Paul Champagne—were given extensions of their FMLA leave without providing definite return dates by claiming that it acted consistently with respect to all of its employees, regardless of gender. The defendant contends that Santos was terminated for her failure to provide both the required medical leave certification and a definite return to work date.

Shields posits that the situation involving McBride is distinguishable for two reasons. First, the company determined that McBride's back injury prevented him from doing his job while the plaintiff's injury was not as severe prior to her surgery. Second, the defendant claims that McBride's doctor gave Shields a date upon which he could return to work while Santos' doctor was not able to provide the defendant with such definite information. In effect, Shields has explained that it was not the plaintiff's gender that caused her to be treated differently than McBride; instead, it was her inability to provide a definite return to work date, her failure to produce the required medical certification, and the defendant's perception that she was suffering from a less than serious health condition.

Regarding the situation involving employee Champagne, Shields asserts that he, like Santos, was granted a three week extension to his leave and that he, like Santos, was subsequently terminated for failure to provide Shields with its requested doctor's certification of a specific return-to-work date. In fact, the plaintiff has conceded that after both she and Champagne were not able to perform their job duties and unable to provide definite return dates, they were consequently dismissed.

Thus, according to Shields, it has adequately articulated nondiscriminatory reasons for Santos' termination.

The burden now shifts back to the plaintiff to show that Shields' reasons are merely a pretext for discrimination. Although Santos, in her memorandum opposing summary judgment, provides additional arguments questioning the validity of Shields' nondiscriminatory reasons for terminating her, the plaintiff proffers nothing to suggest that the reasons for treating William McBride as it did were pretextual. The same cannot be said with respect to Paul Champagne, however. If Santos and Champagne were in the same position as Shields contends, the question arises as to why he was afforded nearly six and a half months of leave before he was terminated (# 27, Exh. N) whereas Santos was given only three months and three weeks. The defendant offers no reason or explanation for this discrepancy, and it suffices to raise a genuine issue of material fact as to whether the plaintiff was treated differently so as to foreclose the entry of summary judgment on the discrimination claims.

### V. Conclusion

For all the reasons stated, it is ORDERED that Defendant Shields Health Group's Motion For Summary Judgment Pursuant To Fed. R.C.P. 56(# 23) be, and the same hereby is, ALLOWED with respect to Counts I, II, and III of the complaint in their entirety. It is FURTHER ORDERED that the motion be, and the same hereby is, ALLOWED with respect to Counts IV and V to the extent that the claims relate to William McBride. It is FURTHER ORDERED that the motion be, and the same hereby is, otherwise, DENIED.